**Louise KRYSIAK, Complainant,**

v.

**ACME WIRE COMPANY, Defendant.**

**Civ. A. No. 33622.**

United States District Court
N. D. Ohio, E. D.

Jan. 13, 1959.

Harrison, Spangenberg & Hull, Cleveland, Ohio, Oliver W. Hasenflue, Cleveland, Ohio, of counsel, for plaintiff.

Thompson, Hine & Flory, Cleveland, Ohio, Arthur F. Zalud and Wm. G. Batchelder, Jr., Cleveland, Ohio, of counsel, for defendant.

McNAMEE, District Judge.

Plaintiff has filed a motion for a new trial complaining of the action of the Court in entering judgment for defendant at the conclusion of plaintiff's evidence. It is plaintiff's position that the evidence offered on her behalf presented a case that ought to have been submitted to the jury either under the doctrine of *res ipsa loquitur* or on the theory that plaintiff had made out a prima facie case of circumstantial evidence of negligence.

Briefly stated, the evidence, construed most favorably to the plaintiff, shows the following facts:

Plaintiff is a resident of Cleveland, Ohio, and was employed as a press operator for the Telectron Company which, at the time in question, was engaged in the manufacture of deflection yokes at Cleveland, Ohio. Defendant, Acme Wire Company, is a foreign corporation with its principal place of business located at New Haven, Connecticut. The function of a deflection yoke is to transcribe beams of electrons across a television screen. The yokes are made of small strands of wire which are wound in coils, heated and formed into appropriate shapes. The wire used in the coils has an adhesive coating and there are two known methods by which the wire may be "softened" and "bonded" into the desired forms. The first method is by the use of solvents, the second by the application of heat. Until 1952 or 1953 Telectron used the solvent method. Later it changed to the heating process and, after using that method for awhile, it increased the intensity of the heat in order to speed up production. In the process of manufacturing yokes, coils of wire are placed on a conveyor which moves rapidly under infra red ray light bulbs capable of inducing intense heat. In the center of the conveyor and projecting upward from it is a blower which, as explained by the Production Manager of Telectron, is used to "evacuate" the heat and the fumes caused by the application of heat to the wire. The conveyor was enclosed except for openings at each end and was approximately 15 inches high and about a foot wide. The outer surface of the infra ray bulbs was within 6 to 8 inches of the surfaces on which the wire coils were carried. The temperature in the conveyor was determined on the basis of specifications and engineering data supplied by Wire companies other than defendant and was as high as 400 to 600 degrees Fahrenheit. Telectron purchased its wire from the Essex Manufacturing Company, the Phelps-Dodge Company and others. It was shown that no matter from what source the wire was procured the heating process usually produced some fumes but never before the time in question had the fumes injuriously affected the health of those working at or near the conveyor.

Early in December 1955 Telectron received a shipment of wire from defendant consisting of approximately 500 pounds of wire of the size used in the manufacture of deflection yokes. Whether this was the first shipment of such wire from Acme is not entirely clear, although the Production Manager of Telectron was unable to say positively that such wire had been received from Acme prior thereto. The wire was placed in the stockroom, where it remained until December 15, 1955, when it was used in the manufacture of the yokes. On the first day Acme wire was used there was a noticeably unpleasant pungent odor, which caused only slight discomfort to the employees of Telectron. On the second day of its use, however, the odor became stronger and caused serious discomfort and distress to the employees working at or near the conveyor. Women employees complained of "smarting" and "tearing" of the eyes—of nausea and of sickness generally. The odor was described as—"it just smelled terrible"—"it made you cough"—"your throat burned," etc. A witness said she had lost her voice as a result of the fumes. Many of the employees complained to their im-

mediate superiors but were directed to continue working. Plaintiff was among those who complained and protested. In relating one conversation with her boss, Vickers, plaintiff testified she said: "Dave, this is making me sick—my eyes are burning. What should I do?" and that Vickers responded by saying "Keep running them through." The engineering staff and the Production Manager of Telectron were aware of the condition and the continuous and many protests from the workers but, as the Production Manager testified, "Frankly, we overlooked the protest for a few days * * *." On cross-examination the Production Manager testified:

"Q. Let me ask you if in your opinion the working conditions there were all right as far as people continuing to work in that atmosphere was concerned? A. I would say due to the circumstances that evolved certainly they were not, but at the time it was impossible to determine whether or not these were going to be effective in an injurious effect on anybody in the surrounding area."

The same condition prevailed throughout the five day work period of the week of December 15th, during which time the complaints and protests continued. Nothing was done to relieve or correct the situation except to order the windows opened and there was testimony that this afforded no relief, particularly when the wind was "blowing in." During the week of December 22nd plaintiff and other workers were compelled to continue working under the same conditions for one-half day during each of the first three days of that week, after which the plant closed down for the Christmas holiday.

Upon returning home on the evening of the eighth day of working under the above conditions plaintiff became ill and went to a hospital for an examination and treatment.

After January 1956 Telectron purchased additional wire from Acme but on February 23, 1956 it returned all of the wire purchased from the defendant and received credit therefor.

There is no evidence tending to show that before December 1955 Acme had knowledge of the heating method employed by Telectron in the manufacture of its yokes. Further facts will be referred to in the discussion.

■■ It is at once apparent that the doctrine of *res ipsa loquitur* has no application. It is clear that the defendant had no control over the instrumentality that caused plaintiff's injuries. Telectron was at all times in exclusive control of the wire and the application of heat to it. It is the general rule that the *res ipsa loquitur* doctrine has no application when defendant is not in exclusive control of the instrumentality which caused plaintiff's injuries. City of Maryville v. Farmer, 6 Cir., 244 F.2d 456; Krupar v. Procter & Gamble, 160 Ohio St. 489, 117 N.E.2d 7. Plaintiff relies on Fick v. Pilsener Brewing Co., Ohio Com.Pl., 86 N.E.2d 616, 621, as authority for extending the doctrine of *res ipsa loquitur* to the facts of this case. As the author of the opinion in Fick, I am unable to perceive even a remote analogy between the two cases. The Fick case involved an injury to the plaintiff that was caused by the explosion of a bottle of beer. It was there shown that the bottle had been handled in a careful and proper manner and that no external force had been applied to it from the time it left the brewery until plaintiff was injured. The principle of the Fick case is epitomized in the following statement of the opinion:

"The present trend of judicial thinking is definitely toward the application of the doctrine in cases involving the explosion of bottles of carbonated beverages, where the evidence excludes any efficient cause of injury except the permissible inference of defendant's negligence."

The principle of the Fick case has been approved by the Supreme Court of Ohio in Koktavy v. United Fireworks Mfg. Co., 160 Ohio St. 461, 117 N.E.2d 16, 21. But the Court was careful to point out that in cases where the offending instrumentality was not in the exclusive possession of the defendant "there must be a complete showing that

the instrumentality could not have been mishandled or tampered with between the time of its leaving the custody of the one sought to be charged and the time of the accident causing the injury." Manifestly, the doctrine as extended in the Fick case has no application here.

■ Nor has the plaintiff made out a prima facie case of negligence by circumstantial evidence. The issue of negligence is to be determined by the question of whether or not a party has guarded against those things which he might have reasonable cause to anticipate. 29 Ohio Jur. 392; Baltimore & O. R. Co. v. Wheeling, P. & C. Transportation Co., 32 Ohio St. 116; Garbo v. Walker, Ohio Com.Pl., 129 N.E.2d 537.

The evidence does not show that defendant had knowledge of the method employed by Telectron in "bonding" its wire and defendant had no reason to anticipate that the use of its wire would produce fumes deleterious to the health of plaintiff or any of the employees of Telectron. Even if it be assumed that defendant knew that Telectron applied heat instead of using solvents, there is no evidence tending to show that defendant was familiar with Telectron's practice of generating and applying heat of such intensity as 400–600 degrees Fahrenheit. The record is barren of any evidence tending to show that defendant had reason to anticipate that the health of Telectron's employees would be endangered by the use of its wire in the manufacture of deflection yokes. Plaintiff concedes that there is an absence of direct proof of any specific act of negligence and is unable to state in what respect defendant breached any duty it owed to Telectron or its employees.

■■ If it be assumed, however, that defendant was negligent, it nevertheless follows that plaintiff has not established a prima facie case of actionable negligence. It is fundamental that to establish actionable negligence the one seeking recovery must show the existence of the duty on the part of the one sued, a breach of that duty and an injury proximately caused by such breach. It is also well settled that where a criminal or negligent act of a third person which could not have been foreseen by the original tortfeasor intervenes to cause the injury, the criminal or negligent act becomes a superseding cause of the injury. 38 Am. Jur. 728, 729, §§ 71, 72; 29 Ohio Jur. 499, § 80.

The rule of superseding cause has been applied in a great variety of factual situations. Recently it was applied by the Supreme Court of Ohio in Thrash v. U-Drive-It Co., 158 Ohio St. 465, 110 N.E. 2d 419.

Although the facts in the cited case are dissimilar, the principle therein announced is applicable here. It was held in the second paragraph of the syllabus of the Thrash case:

"Where there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency."

The application of the foregoing principle to the facts of this case fully supports the judgment here rendered for defendant. The Telectron Company "could and should have eliminated the hazard" to the health of its employees when it learned that such hazard existed. Telectron had ample opportunity to eliminate the fumes that caused its employees suffering and distress. It could have replaced the wire in use, reduced the intensity of the heat or adopted other measures to eliminate the hazard. Telectron knew that the atmospheric conditions in its plant endangered the health of its employees. Yet, with complete indifference to their welfare, it deliberately compelled its employees to continue working for a period of eight days in a place of employment that was unsafe. By its negligent conduct Telectron violated the positive duty imposed upon it by Section 4101.12, Ohio Rev.Code, which reads:

"No employer shall require, permit, or suffer any employee to go or

580

be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe."

By the provisions of Sections 4101.15, 4101.16 and 4101.99 a violation of Section 4101.12 is punishable by a fine of not less than $50 nor more than $1,000 for each day's violation of the statute.

It would be stretching the principle of foreseeability beyond all reasonable limits to hold that defendant, Acme Wire Company, ought to have foreseen the persistent daily violation of duty by Telectron. There can be no doubt that Telectron's negligence in failing to provide plaintiff with a safe place to work was the sole proximate cause of plaintiff's injuries. Plaintiff has no justifiable claim against defendant.

Motion for new trial is overruled.